**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHESTNUT STREET** | : | CIVIL ACTION |
| **CONSOLIDATED, LLC,** | : | |
| | : | |
| Plaintiff, | : | NO. 21-3046 |
| | : | |
| v. | : | |
| | : | NONJURY |
| **BAHAA DAWARA,** | : | |
| | : | |
| **IMAD DAWARA,** | : | TRIAL: |
| | : | January 18-19, 2022 |
| **FATAN DAWARA** | : | |
| **a/k/a FATEN DAWARA** | : | TRIAL DEPOSITIONS: |
| | : | March 29 & 31, 2022 |
| **MAISAA DAWARA,** | : | |
| | : | |
| **MIRVAT DAWARA,** | : | |
| | : | |
| **ABEER NAIM,** | : | |
| | : | |
| **HITHAM ALBAROUKI** | : | |
| **a/k/a HAITHAM ALBAROUKI,** | : | |
| | : | |
| and | : | |
| | : | |
| **DOE INDIVIDUALS (1-10),** | : | |
| | : | |
| **DOE ENTITIES (1-10),** | : | |
| | : | |
| Defendants. | : | |

---

**PLAINTIFF CHESTNUT STREET CONSOLIDATED, LLC'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Chestnut Street Consolidated, LLC, by and through undersigned counsel, Gellert

Scali Busenkell & Brown LLC, hereby submits is proposed findings of fact and conclusions of

law.

# TABLE OF CONTENTS

**PROPOSED FINDINGS OF FACT** ........................................................................ **4**

    Introduction ............................................................................................................ 4

    Parties ................................................................................................................... 13

    The Arson Conspiracy ......................................................................................... 15

    The Concealment of Assets – Prior to Arrest .................................................... 19

    The Concealment of Assets – After Arson and Arrest ....................................... 20

    The Conspiracy Sought to Protect Assets for the Family ................................... 24

    The Incarcerated Defendants Retained Control over Transferred Assets ............. 27

    Defendants' Lack of Credibility ......................................................................... 30

    Incarcerated Defendants received no value in exchange for the transfers ............ 31

    Incarcerated Defendants' Resulting Financial Condition ................................... 32

    Purported Defenses: Lease Purchase Not Credible Transactions ........................... 32

    Purported Defenses: Lease Purchase Not Reasonable Equivalent Value .............. 37

    The $1,000,000 Restitution Obligation Has Been Fulfilled or Will Inevitably be Fulfilled

    from the Sale of Seven Properties ....................................................................... 38

**PROPOSED CONCLUSIONS OF LAW** ............................................................. **40**

    Jurisdiction, Venue and Applicable Law ........................................................... 40

    Voidable Transfers .............................................................................................. 41

    Actual Fraud ........................................................................................................ 41

    Direct Indications of Fraudulent Intent .............................................................. 45

    Implicit Suggestions of Fraudulent Intent .......................................................... 45

    Probative Value Based on Circumstances ........................................................... 46

    Assessment of the Proofs as to Actual Fraud ..................................................... 48

    Punitive Damages for Actual Fraud .................................................................... 49

    Constructive Fraud .............................................................................................. 52

    Lack of Reasonably Equivalent Value at the Time of the Transfer .................... 52

    Incarcerated Defendants' Resulting Financial Condition ................................... 54

    Defenses .............................................................................................................. 55

    The Restitution Obligation is Not a Defense ...................................................... 55

    The Lease Purchase Agreements Did Not Reflect Reasonably Equivalent Value ................. 58

Remedies ........................................................................................................ 63

Claw Back and Transfer to Plaintiff (3 Properties)  and Money Judgment (7 Properties) ..... 63

Punitive Damages .......................................................................................... 64

The Defendants Are Jointly and Severally Liable ................................. 65

The Plaintiff is Entitled to Pre-Judgment and Post-Judgment Interest ................. 66

Judgment ........................................................................................................ 67

**CERTIFICATE OF SERVICE** ............................................................................ **71**

## PROPOSED FINDINGS OF FACT

### Introduction

1.      On February 18, 2018, Imad Dawara and Bahaa Dawara (the "Incarcerated Defendants") intentionally set fire to two beautiful buildings in the vibrant heart of historic Old City Philadelphia, 239 Chestnut Street and 241-43 Chestnut, Street (collectively the "Buildings"), causing a 4-alarm fire that decimated these buildings, threatened many lives and caused tens of millions of dollars in property damage (the "Fire"). [Ex. P8G[1], p. 436; P5G, p. 236]

<span style="color:red">Pltf Trial Exhibits p. 503</span>



Source: https://www.inquirer.com/news/old-city-fire-capogiro-little-lion-arson-20191017.html

2.      The Incarcerated Defendants admitted setting the Fire and were convicted of conspiracy to commit arson, among other criminal charges. [Ex. P1C; Ex. P5H; Ex. P5I; Ex. P8G, pp. 436, 439-440]

---

[1] Plaintiff's ("P") Exhibits P1A to D, P2, P3A to 3S, P4A to 4S, P5A to 5J, P6A to 6N, P7, P8A through 8G, P9A through 9E-P9 were admitted into evidence at Trial Transcript ("TT") Day 1, p. 7, lines 5-16.  Exhibits P10A through P10 K were admitted into evidence pursuant to the agreement of the parties and approved by the court at Docket Item No. ("Doc.") 111 dated 5/17/2022.  For ease of reference, Plaintiff's Trial Exhibits have a page number at the top right corner that is cited after the exhibit.

3.      Plaintiff, Chestnut Street Consolidated, is the owner of claims against the Incarcerated Defendants by purchase and assignment from the individual and corporate victims of the Incarcerated Defendants' crimes. [Exs. P9A-P9E, Mogilyansky TT Day 1, p. 23, l. 4-10] The assignors of these claims are the owners of multiple condominium units that were located in the Buildings on February 18, 2018, including all but one unit in the completely destroyed in Building at 239 Chestnut Street, and three out of eight units in the Building at 241-43 Chestnut Street. [Mogilyansky TT Day 1 p. 14, l. 3-10; P9A-P9E]

4.      The post fire damage to the Buildings and condominium units were generally depicted in various photographs:

Pltf Trial Exhibits p. 504



Source: https://www.phillyvoice.com/old-city-fire-arson-philadelphia-brothers-charged-dawara-feds-2018-chestnut-street/

Pltf Trial Exhibits p. 505



Source: http://www.rising.realestate/site-of-historic-old-city-fire-is-for-sale/

Pltf Trial Exhibits p. 506



Source: https://www.trulia.com/p/pa/philadelphia/241-43-chestnut-st-c-philadelphia-pa-19106--2204960519?mid=0#lil-mediaTab

[Ex. P12, pp. 504 to 506]

6

5.      These destroyed and severely damaged properties constitute all the uninsured real estate that was destroyed by the Fire in the Buildings, and much of the severely underinsured real estate. [Mogilyansky TT Day 1 p. 14, l. 3-10; Exs. P2, P9A to P9E]

6.      Shortly after the Incarcerated Defendants' arrest on October 16, 2019, Plaintiff and its predecessors in interest sued the Incarcerated Defendants in the Philadelphia Court of Common Pleas (the "Philadelphia Case")[2]. [Ex. P1A, p. 1, P1C, p. 77] After their guilty pleas [Exs. P5C and P5D] the Incarcerated Defendants expressly acknowledged that they are liable to Plaintiff in the Philadelphia Case. That court has entered judgment as to liability. [Ex. P1C]

7.      The unreimbursed losses sustained by CSC's predecessors in interest was described in detail by CSC's representative, Mr. Mogilyansky, at trial. No evidence has been submitted to refute or contest the Plaintiff's proof of damages. The Un-incarcerated Defendants responded to discovery as follows:

> 9.      Defendants have no evidence to challenge the amount of losses set forth in Schedule 2.
>
> Response: Responding defendants are not contesting the damages claimed by plaintiff …

[EX P8G, p. 441]

8.      Mr. Mogilyansky summarized the damages sustained by CSC and its claim assignors in a chart that is compiled from the evidence submitted by CSC. The chart is in evidence as Exhibit P2 and provides as follows:

[2] Court of Common Pleas of Philadelphia County, November Term 2019, Case No. 03370.

7

| SUMMARY OF ALL LOSSES SUSTAINED BY PLAINTIFFS | | | | |
|---|---|---|---|---|

| Interior Areas | Loss per SF | Area SF | Loss / Offset | Original Owner / Assignor |
|---|---|---|---|---|
| 239-COMM-1 (Main Floor) | $300 | 2,600 | $780,000 | FSC |
| 239-COMM-1 (Basement) | $200 | 2,500 | $500,000 | FSC |
| 239-RU-1 (Uninsured) | $300 | 2,300 | $690,000 | FSC |
| 239-RU-2 (Uninsured) | $300 | 2,300 | $690,000 | FSC |
| 241-B (Uninsured) | $300 | 1,200 | $360,000 | FSC |
| 241-C (Partially insured - see offset below) | $300 | 2,200 | $660,000 | Ciurlino |
| 239-RU-4 (Uninsured) | $300 | 2,400 | $720,000 | Gelbart |
| 241-G (Uninsured) | $300 | 2,200 | $660,000 | Gelbart |
| 239/241-Deck (Partially insured - see offset below) | | | $500,000 | Gelbart |
| 241-C Insurance (paid at limit minus 5% adjustor) | | | -$105,165 | Ciurlino |
| 241-G insurance (paid at limit) | | | -$288,309 | Gelbart |
| | | Total Uninsured Loss (Interior Areas): | $5,166,526 | |

| Uninsured Loss of 239 Building | Uninsured Loss | Share | Share of Loss | Original Owner / Assignor |
|---|---|---|---|---|
| Fresher Start (67.3% Member) | $3,964,558 | 67.30% | $2,668,147 | FSC |
| Steven Gelbart (16.7% Member) | $3,964,558 | 16.70% | $662,081 | Gelbart |
| | | Total Uninsured Loss of (239 Building): | $3,330,228 | |

| Loss of Rents | Monthly Rent | Months | Loss of Rent | Original Owner / Assignor |
|---|---|---|---|---|
| 239-RU-1 | $2,750 | 28 | $77,000 | FSC |
| 239-RU-2 | $3,000 | 28 | $84,000 | FSC |
| 239-COMM-1 and 241-B | $9,200 | 28 | $257,600 | FSC |
| 241-C | $2,175 | 28 | $60,900 | Ciurlino |
| 239-RU-4 | $1,700 | 40 | $68,000 | Gelbart |
| | | Total Loss of Rents: | $547,500 | |

| Summary of All Claims | | Amount | Assignee |
|---|---|---|---|
| | Total Uninsured Loss (Interior Areas): | $5,166,526 | CSC |
| | Total Uninsured Loss of (239 Building): | $3,330,228 | CSC |
| | Total Loss of Rents: | $547,500 | CSC |
| | TOTAL LOSSES: | $9,044,254 | |

[Ex. P2, p. 79; Mogilyansky TT Day 1, p. 16, l. 18 through p. 23, l. 10]

9.      Since the fire, the Incarcerated Defendants were indebted to CSC in the total sum

set forth in the chart, in excess of $9,000,000, as well as punitive damages for their egregious

misconduct. [Ex. P2, p. 79; Mogilyansky TT Day 1, p. 44, l. 18 through 25]

10.     As Plaintiff learned only on June 24, 2021, while the Incarcerated Defendants were

claiming to have accepted responsibility for their crimes before this Court and purported to express

remorse and apologies to their victims (including in open court during the sentencing proceedings

in the criminal case on June 22-24, 2021), behind the scenes they had conspired to further harm

8

their victims by fraudulently transferring their last remaining assets to their siblings in a brazen attempt to thwart their victims' ability to recover civil damages in the Philadelphia Case. [Ex. P2, p. 79; Mogilyansky TT Day 1 p. 23, l. 18 to p. 28, l. 15]

11.    CSC has since learned that while Imad Dawara pled guilty, he still does not accept responsibility for his crimes. [Imad Dawara DT, p. 9, l. 4-16, p. 10, l. 1-19] This evidence establishes further proof of the deception utilized by him (at the very least) to buy time to conspire to further harm his victims by fraudulently transferring his last remaining assets to siblings to thwart their victims' ability to recover civil damages in the Philadelphia Case.

12.    This included fraudulent transfers that took place within mere days of the Incarcerated Defendants' arrest in October 2019, followed by fraudulent transfers made in the weeks leading up to their sentencing by this Court in June 2021. [Ex. P7, p. 364 compiled from P6A through P6N, pp. 264-357]

13.    Among these fraudulent transfers are transfers of ten (10) properties previously owned by the Incarcerated Defendants out of their names to joint ownership with relatives in November 2019 for $1 consideration, followed by further $1 transfers of at least two of these properties to Incarcerated Defendants' siblings' names in or about April 2021. [Ex. P7, p. 364 compiled from P6A through P6N, pp. 264-357]

14.    The following chart illustrates the ten properties owned by the incarcerated Defendants when the Plaintiff's lawsuit in state court was filed:



[Ex. P11, p. 509]

15.    Weeks later, a fifty percent interest to each of the ten properties had been transferred away to family members:



[Ex. P11, p. 510]

16.     After the Plaintiff had filed a motion for summary judgment against the Incarcerated Defendants in state court, the full interest two properties had been promptly transferred to two family members:



17.     The entire scope of the fraudulent scheme is evidenced by the sheer volume of fraudulent transfers. [Ex. P7, p. 364 compiled from P6A through P6N, pp. 264-357]

18.     Despite having transferred at least 50 percent interests in the properties to family members, the Incarcerated Defendants agreed to sell or arrange to sell seven of the ten properties to fulfill part of their restitution obligations. [Ex. P5E1, p. 214]

19.    At the time trial commenced, four properties had ben sold to fund the Incarcerated

Defendants' restitution obligations and there were still listed for sale:



[Ex. 12, p. 514]

20.    The fact that the proceeds of four transferred properties were used to satisfy the

restitution obligations of the Incarcerated Defendants reflects the control of the transferors despite

the transfers - an important badge of the overall fraud. [Ex. P5E1, p. 214]

21.    In this action Plaintiff seeks to equitably claw back only three of these fraudulent

transfers. Specifically, Plaintiff seeks to claw back the transfers of three properties valued at

approximately $813,600 which the Incarcerated Defendants do **not** have to sell under their

restitution agreement with the government in their criminal case: 19 Ridgeway, 407 Seminole and

305 Seminole. [Ex. P5E1, p. 214; Mogilyansky TT Day 1 p. 52, l. 15 to 24]

22.    Plaintiff also seeks a judgment against all defendants for the value of the properties

that **are** subject to the restitution agreement but does not seek to avoid the transfer since these

properties have already been sold, or are in the process of being sold, to third parties. [Mogilyansky TT Day 1 p. 71, l. 7 to 22, p. 72, l. 19 to p. 74, l. 21, p. 123, l. 6-13]

23.    Plaintiff asks the court to avoid the transfers or obligations to the extent necessary to satisfy the Plaintiff's claim. Ex. [Mogilyansky TT Day 1 p. 71, l. 7 to 22, p. 72, l. 19 to p. 74, l. 21] The entire transactions for the three subject properties should be set aside and title to the properties transferred to Plaintiff, subject to any prior existing mortgage liens, to be fairly valued at the time of transfer and credited against the Plaintiff's overall money judgment against the Incarcerated Defendants. [Mogilyansky TT Day 1 p. 71, l. 7 to 22, p. 72, l. 19 to p. 74, l. 21]

24.    Plaintiff asks the court to award punitive damages against all defendants due to the egregious nature of these fraudulent transfers and scheme. [Mogilyansky TT Day 1 p. 89, l. 9 to 10] Considering the history of the defendants' disregard of the law and egregious conspiracy to deprive the victims of recovery, the severest penalties are appropriate in this case. [Mogilyansky TT Day 1 p. 69, l. 19 to p. 70 l. 23]

## Parties

25.    Plaintiff Chestnut Street Consolidated, LLC is a Delaware entity. All members of Plaintiff are Delaware corporations. [Mogilyansky TT Day 1 p. 37, l. 15 to p. 22; Ex. P8B1]

26.    Defendant Imad Dawara is an individual citizen of the Commonwealth of Pennsylvania currently held in the custody of the Federal Bureau of Prisons. [Ex. P8D, P8G, p. 437]

27.    Defendant Bahaa Dawara is an individual citizen of the Commonwealth of Pennsylvania currently held in the custody of the Federal Bureau of Prisons. [Ex. P8D; P8G, p. 437]

28.     Defendant Fatan Dawara is an individual citizen of the Commonwealth of Pennsylvania. Fatan Dawara is a sibling of the Incarcerated Defendants. In transactions giving rise to this Complaint, intentionally or not, Fatan Dawara disguised her name as Fat**e**n Dawara. [Ex. P8C; P8G, p. 437]

29.     Defendant Maisaa Dawara is an individual citizen of the Commonwealth of Pennsylvania. Maisaa Dawara is a sibling of the Incarcerated Defendants. [Ex. P8C; P8G, p. 437]

30.     Defendant Mirvat Dawara is an individual citizen of the Commonwealth of Pennsylvania. Mirvat Dawara is a sibling of the Incarcerated Defendants. [Ex. P8C; P8G, p. 437]

31.     Defendant Abeer Naim is an individual citizen of the Commonwealth of Pennsylvania. Abeer Naim is the spouse of Imad Dawara. [Ex. P8C; P8G, p. 437]

32.     Defendant Hitham Albarouki is an individual citizen of the Commonwealth of Pennsylvania. Hitham Albarouki is the brother-in-law of the Incarcerated Defendants and the husband of Fatan Dawara. In transactions giving rise to this Complaint, intentionally or not, Hitham Albarouki disguised his name as H**a**itham Albarouki. [Ex. P8C; P8G, p. 437]

33.     Defendants Imad Dawara and Bahaa Dawara are referred herein collectively as the "Incarcerated Defendants"), and defendants Fatan Dawara (a.k.a. Faten Dawara), Maisaa Dawara, Mirvat Dawara, Abeer Naim, and Hitham Albarouki (a.k.a. Haitham Albarouki) are referred to herein collectively as the "Un-incarcerated Defendants." [Ex. P8C; P8G, p. 437]

34.     The following chart summarizes the familial relationships among the defendants:

Pltf Trial Exhibits p. 508



[Ex. P. 11, p. 508; P8G, p. 437]

**The Arson Conspiracy**

35.    On February 18, 2018, the Incarcerated Defendants intentionally started the Fire that destroyed or severely damaged the leased premises and Plaintiff's other real and tangible property. [Ex. P8G, p. 436; Ex. P5C, p. 211.1; Ex.P5D, p. 211.19; P5F, p. 223]

36.    On July 18, 2019, a federal grand jury returned a 10-count indictment against the Incarcerated Defendants for the arson conspiracy and related crimes. [Ex. P5B]

37.    It is undisputed that the facts set out in count one of the indictment [Ex. P5B, pp. 193-202] are true. [Bahaa Dawara DP, p. 7, l. 8-16]

38.    On October 16, 2019, the Incarcerated Defendants were arrested at the Philadelphia International Airport. [Imad Dawara Deposition Transcript ("DT") p. 15, l. 14-16; Bahaa Dawara DT, p. 34, l. 19-21]

15

39.     In October of 2020, over one year after their arrest, the Incarcerated Defendants entered into a plea agreement with the United States Attorney's office. [Ex. P5C, p. 211.1; Ex.P5D, p. 211.19]

40.     On October 27, 2020, the Incarcerated Defendants signed an agreement with the United States Attorney's office that provided in pertinent part:

Toward this end, the government and the defendants, Imad Dawara and Bahaa Dawara, by their attorneys, agree to the following terms and conditions regarding restitution:

(1)     Defendants Imad Dawara and Bahaa Dawara are jointly responsible for harms sustained by the victims in Case No. 19-CR-414 in the amount of not less than $22,000,000.00. This amount is subject to modification by the government as it continues to receive loss information from victims who it believes may be entitled to receive restitution.

[Ex. P5E1, p. 212]

41.     On February 25, 2021, the Incarcerated Defendants pled guilty to the arson conspiracy, as well as the subsequently charged crimes of tax evasion and fraud against the United States. [Ex. P5C, p. 211.1; Ex P5D, p. 211.19]

42.     On June 22 and 24, 2021, respectively, Imad Dawara and Bahaa Dawara were sentenced to identical prison sentences of 108 months and ordered to pay over $22 million in restitution. [Ex. P5H, p. 240; EX. P5I, p. 254]

43.     As part of their guilty pleas, the Incarcerated Defendants admitted to intentionally setting fire to the buildings located at 239 and 241-43 Chestnut Street on February 18, 2018. [Ex. P5C, p. 211.1; Ex. P5D, p. 211.19; P5F, p. 223]

44.     The Incarcerated Defendants conspired to commit their violent crime of arson out of a dual motivation: financial gain and retribution against their landlord[3]. [Ex. P5C, p. 211.1; Ex. P5D, p. 211.19; P5F, p. 223]

45.     The motivation to commit arson included the financial difficulties faced by the Incarcerated Defendants. Count 1 of the indictment for which they plead guilty specifically provided:

14.  In December 2016, defendants IMAD DAWARA's and BAHAA DAWARA's insurance policy for RCL Management at 239-41 was cancelled for failure to pay the premium.  Although their lease required that they maintain insurance, defendants IMAD DAWARA and BAHAA DAWARA remained un-insured at 239-41 from December 2016 to on or about February 2, 2018.

15.  In October 2017, defendants IMAD DAWARA and BAHAA DAWARA ceased all business operations for RCL Management at 239-41 Chestnut.

16.  On November 2, 2017, D.C., through his attorney, sent, via regular mail, certified mail, and email, a Notice of Default to RCL Management and defendants IMAD DAWARA and BAHAA DAWARA at 239-241 Chestnut Street for failure to pay monthly rent for November 2017 and arrearage payments totaling $20,932.

17.  From June 2017 to on or about January 2018, defendants IMAD DAWARA and BAHAA DAWARA attempted, but failed, to sell the business at 239-41 Chestnut.

---

[3] The landlord is one of the assignors of the claims being pursued by Plaintiff in this action, constituting $6,661,582 of the $9,044,254 total amount of losses, or approximately 73.6% of the total claims.

21.  In and around January 2018, defendant IMAD DAWARA threatened D.C. stating, "don't think you're going to get rid of me that easily."

22.  On January 31, 2018, D.C, through his attorney, sent, via regular mail, certified mail, and email, a Notice of Lease Termination to RCL Management and defendants IMAD DAWARA and BAHAA DAWARA at 239-241 Chestnut. The letter directed defendants IMAD DAWARA and BAHAA DAWARA to vacate the premises by February 2, 2018.  The letter advised that the balance on the lease due to D.C. was $64,720.

23.  On January 31, 2018, defendant IMAD DAWARA contacted A.D. at Progress Brokerage Group to inquire about purchasing insurance for 239-41 Chestnut.

24.  On February 1, 2018, defendant IMAD DAWARA met with A.D. to obtain a new insurance policy and asked him repeatedly how defendant IMAD DAWARA would be paid "if there was a fire."

[Ex. P5B, p. 196-197]

46.    The sentencing memorandum filed by Imad Dawara provided in pertinent part:

18

Defendant Imad Dawara has no criminal record other than the charged offenses in this matter.  Prior to his involvement in the instant offenses, Imad Dawara was living the American dream and had made a great life for himself.  He was born in 1979 in Libya and lived in Syria from 1979 to 2001 when he immigrated to the United States.  He became a naturalized citizen on May 24, 2006.  He is married to his wife Abeer and they have two children, Hisham and Tammam, ages 13 and 10 respectively.

The Defendant is from the very tight-knit Syrian-American community.  He has worked very hard to establish several businesses and support his family.  It is extremely unfortunate that when faced with financial difficulties, he and his brother resorted to arson to solve their financial troubles.  He committed a very serious crime and the agreed upon aggregate sentence of nine years in prison will take him away from his family for a very long time and is an appropriate sentence in this matter.

[Ex. P5, p. 226]

## The Concealment of Assets – Prior to Arrest

47.     The Incarcerated Defendants have significant ties to their native land of Syria and neighboring countries. Upon arrest in this case, Imad Dawara and Bahaa Dawara, both naturalized U.S. citizens, were found to also have Syrian passports. [Imad Dawara DT, p. 10, l. 20 to p. 11, l. 20; Bahaa Dawara DT, p. 8, l. 8 to p. 9, l. 16]

48.     In 2019, the Incarcerated Defendants traveled to Syria, where they celebrated Bahaa Dawara's marriage to a Syrian citizen with their respective families. [Imad Dawara DT, p. 12, l. 10 to 17; Bahaa Dawara DT, p. 9, l. 2 to p. 9, l. 16]

49.     Bahaa Dawara traveled out of the United States eight times in the five years preceding his arrest, with the majority of those trips to the Middle East. [Bahaa Dawara DT, p. 9, l. 2 to p. 9, l. 16]

50.     Imad Dawara's and Bahaa Dawara's many business entities included a nightclub on Delaware Avenue, "B-Side," where they directed two other individuals to use their names as the listed owners of the club and the liquor license that they need to operate the club. [Bahaa Dawara DT, p. 9, l. 24 to p. 10, l. 23, p. 11, l. 3-23, p. 16, l. 12-18; Imad Dawara DT, p. 13, l. 3 1. 10, p. 15, l. 5-13, p. 21 l. 6- l. 20, p. 92 l. 9 to l. 24]

**The Concealment of Assets – After Arson and Arrest**

51.     It is undisputed that on February 18, 2018, the only significant assets of the Incarcerated Defendants were the ten properties which are subject of this litigation. [Imad Dawara DT, p. 17, l. 16-24; Bahaa p. 30, l. 24 to p. 31, l. 8]

52.     Since the arson on February 18, 2018 that gave rise to Plaintiff's claims, and particularly shortly after the arrest of the Incarcerated Defendants on October 16, 2019 (and approximately a year prior to their plea agreement), the Un-incarcerated Defendants engaged in the following well-orchestrated fraudulent transfers of at least ten (10) real estate properties (the "Properties") with approximate market value of $2,797,000[4], some transferred multiple times, diverting these valuable assets away from the Incarcerated Defendants' names to the names of others in the Un-incarcerated Defendants, in each instance for a nominal consideration of $1:

| Ex[5] | Property / Parcel ID | Value | Transfers |
|---|---|---|---|
| 1 | 19 Ridgeway Ave Norwood, PA 19074 31-00-01187-00 | 350,600 | 11/2019: Bahaa Dawara => Bahaa Dawara & Faten Dawara *Bahaa Dawara and Faten (Fatan) Dawara are siblings |

[4] Market value estimate obtained on www.zillow.com on June 30, 2021.
[5] The Exhibit number in the left column corresponds to the Exhibits 1 through 10 attached to the Complaint, which contain true copies of deeds available in the public records of Delaware and Philadelphia counties. At trial, they were marked as exhibits P6A through P6N inclusive.

| 2 | 305 Seminole St<br>Essington, PA 19029<br>45-00-01849-00 | 240,800 | 11/2019: Imad Dawara => Imad Dawara & Maisaa Dawara<br>03/2021: Imad Dawara & Maisaa Dawara => Maisaa Dawara<br>*Imad Dawara and Maisaa Dawara are siblings |
| 3 | 407 Seminole St<br>Essington, PA 19029<br>45-00-01841-00<br>45-00-01841-01 | 222,200 | 11/2019: Imad Dawara => Imad Dawara & Mirvat Dawara<br>03/2021: Imad Dawara & Mirvat Dawara => Mirvat Dawara<br>*Imad Dawara and Maisaa Dawara are siblings |
| 4 | 1524 McKean St<br>Philadelphia, PA 19145<br>481103700 | 305,400 | 11/2019: Imad Dawara => Imad Dawara & Abeer Naim<br>*Imad Dawara and Abeer Naim are husband and wife<br>*Haitham (Hitham) Albarouki, who is Imad Dawara's brother-in-law and the husband of Faten Dawara, acted on behalf of Imad Dawara as his power of attorney in this transaction |
| 5 | 321 Massasiot St<br>Essington, PA 19029<br>45-00-00900-00 | 258,600 | 11/2019: Imad Dawara => Imad Dawara & Abeer Naim<br>*Imad Dawara and Abeer Naim are husband and wife |
| 6 | 224 Erickson Ave<br>Essington, PA 19029<br>45-00-00378-00 | 203,000 | 11/2019: Imad Dawara => Imad Dawara & Abeer Naim<br>*Imad Dawara and Abeer Naim are husband and wife |
| 7 | 312 Fern St<br>Darby, PA 19023<br>14-00-00812-00 | 73,800 | 11/2019: Bahaa Dawara => Bahaa Dawara & Faten Dawara<br>*Bahaa Dawara and Faten (Fatan) Dawara are siblings |
| 8 | 134 Garfield Ave<br>Woodlyn, PA 19094<br>38-02-00911-00 | 324,900 | 11/2019: Bahaa Dawara => Bahaa Dawara & Faten Dawara<br>*Bahaa Dawara and Faten (Fatan) Dawara are siblings<br>*Property sold 02/08/21 to satisfy restitution |
| 9 | 140-142 Garfield Ave<br>Woodlyn, PA 19094<br>38-02-00913-00<br>38-02-00912-00 | 289,000 | 11/2019: Bahaa Dawara => Bahaa Dawara & Faten Dawara<br>*Bahaa Dawara and Faten (Fatan) Dawara are siblings<br>*Property sold 02/24/21 to satisfy restitution |
| 10 | 1007 Milmont Avenue<br>Swarthmore, PA 19081<br>38-05-00790-01 | 528,700 | 11/2019: Imad Dawara => Imad Dawara & Abeer Naim<br>*Imad Dawara and Abeer Naim are husband and wife<br>*Property sold 05/14/21 to satisfy restitution |

[Ex. P7, p. 364 – a compilation of the transfers reflected in the deeds marked as Ex P6A through 6N; Mogilyansky TT Day 1 p. 23, l. 18 to p. 28 l. 15, p. 53, l. 3 to 1. 11, p. 54, l. 21 to p. 55, l. 8]

53.     The ten Properties in the above table ("Schedule 1") fall in three groups with respect to the Incarcerated Defendants' restitution agreement with the government in their criminal case:

(a) Three of the Properties, highlighted pink in Schedule 1 and numbered 8, 9, and 10, had been sold prior to the date of the Complaint as part of the

restitution agreement, and an additional two Properties, highlighted blue in the above table and numbered 6 and 7, have been sold since the Complaint was filed ("Sold Properties"). Plaintiff does not seek relief with respect to title of these Sold Properties but does seek punitive damages for their diversion and attempted concealment.

(b) Two of the Properties, highlighted yellow in the above table and numbered 4 and 5, are part of the restitution agreement, subject to sale, and listed for sale, but have not been sold as of the date of this filing ("Pending Properties"). Plaintiff does not seek relief with respect to title of these Pending Properties but does seek punitive damages for their diversion and concealment, and punitive damages for their fraudulent conveyance.

(c) Three of the Properties, highlighted green in the above table and numbered 1, 2, and 3, are exempt from sale under the restitution agreement ("Subject Properties"). These three Subject Properties form the primary target of Plaintiff's collection and execution effort at this time. Plaintiff seeks to avoid the transfers and the sale or turn over to Plaintiff of these Subject Properties to satisfy the Incarcerated Defendants' debt to Plaintiff, as well as punitive damages for their diversion and attempted concealment.

[Ex. P7, p. 364 – a compilation of the transfers reflected in the deeds marked as Ex P6A through 6N; Mogilyansky TT Day 1 p. 53, l. 3 to 1. 11, p. 54, l. 21 to p. 55, l. 8]

54.     The transfers marked "11/2019" in the rightmost column of Plaintiff's Exhibit 7 have varying dates entered in the heading of the deed, next to the signature of the grantor, and the recording stamp by the county, with all three of these dates in each case falling within the

approximately 2.5-month period between mid-October 2019 when the Incarcerated Defendants were arrested, and late December 2019 by which time all these deeds were already recorded. The exact dates can be seen on Plaintiff's Exhibits P6A through 6N. Ex. P7, p. 364 – a compilation of the transfers reflected in the deeds marked as Ex P6A through 6N; Mogilyansky TT Day 1 p. 23, l. 18 to p. 28 l. 15, p. 53, l. 3 to 1. 11, p. 54, l. 21 to p. 55, l. 8]

55.    The names of the Un-incarcerated Defendants members who received title to the Properties are believed to have been intentionally disguised in at least some of the cases to make these assets and transfers more difficult to discover. For example, while Fatan Dawara and Hitham Albarouki are listed with the spelling "FATAN" and "HITHAM" on the March 2020 recorded deed to their residence at 132 South Scott Avenue, Glenolden, PA 19036 [Ex. P6N, p. 359], they listed their names slightly differently on the recorded deeds attached as Plaintiff Exhibit 6G, p. 303 ("H**A**ITHAM") and Plaintiff Exhibits 6J, p. 318, 6K, p. 330, and 6L, p. 342 ("FAT**E**N") just a few months earlier in late 2019.

56.    The above transfers were accomplished in an unabashed but (probably unbeknownst to defendants at the time) poorly disguised effort to frustrate the recovery of Plaintiff on the substantial debt owed by the Incarcerated Defendants. [Ex. P6N, p. 359; Ex. P6G, p. 303; Ex. P6J, p. 318, Ex. P6K, p. 330, and Ex. P6L, p. 342]

57.    At all times since starting the Fire, being arrested, pleading guilty, and at all times thereafter through the present time, the Incarcerated Defendants were aware of their financial obligations for harm caused by the fire they intentionally started. [Imad Dawara DT, p. 13, l. 20 to p. 15, l. 4; Bahaa Dawara DT, p. 71, l. 2 to p. 72, l. 23]

58.    At least two out of three Subject Properties were transferred completely away from the Incarcerated Defendants' names in April 2021, between the entry of the Incarcerated

Defendants' guilty plea and their sentencing. It was during this period that the Incarcerated Defendants, through their attorney in the Philadelphia Case, represented the acceptance of liability, but delayed the entry of a judgment based on purported delays in getting instructions from Incarcerated Defendants to their attorney about the amount. [Mogilyansky TT Day 1 p. 25, l. 3 to p. 28 l. 15]

59.     It is now clear that the true reason for the delay was not a genuine issue of fact (any amount of the judgment in Philadelphia was bound to dwarf the value of Incarcerated Defendants' remaining assets), but the need to transfer the Subject Properties away from the Incarcerated Defendants' names to the names of other members of the Un-incarcerated Defendants. [Mogilyansky TT Day 1 p. 25, l. 3 to p. 28 l. 15]

60.     The timeline of events establishes that the Incarcerated Defendants have acted to conceal and re-title their assets to the Un-incarcerated Defendants ("family") after their arrest in order to evade the obligations owed to Plaintiff. [Mogilyansky TT Day 1 p. 50, l. 4 to p. 51 l. 5]

**The Conspiracy Sought to Protect Assets for the Family**

61.     All the defendants sought was to protect the properties of the Incarcerated Defendants from Plaintiff. Mr. Albarouki testified about protecting the "family" interests several times:

```
 5   Q    How about the -- why were there transfers starting in

 6   2019?  You were here earlier today, correct, and you saw the

 7   charts --

 8   A    Yes, sir.

 9   Q    -- that showed -- there weren't just one transfer, there

10   weren't just two transfers, there were ten properties that were

11   transferred.  They weren't transferred all at one time.  They

12   were transferred at different times in different percentages.

13   Correct?

14   A    Yes, sir.

15   Q    And you participated in all of that as a member of the

16   family.  Correct?

17   A    Yes, sir.
```

[Albarouki TT p. 53]

```
 4   Q    So you knew that the government wanted the seven

 5   properties.  You had a potential to save three properties --

 6   A    Yes, of course.

 7   Q    -- for the family.

 8   A    Yes.

 9   Q    So that's why you did it.

10   A    Yes, sir.  The government wants the seven houses, and we

11   still selling those houses to pay the -- the money back to the

12   government.
```

[Albarouki TT p. 55]

```
3  Q    So Mr. Wolf was hired by the family to do the same thing
4  that Mr. Schultz was doing.
5  A    Yes, sir.
6  Q    And why were these additional transfers needed after so
7  much time?
8  A    Because the -- after the -- my brother signed the plea
9  agreement and the U.S. attorney took the other two houses,
10 that's why we did the second change.
```

[Albarouki TT p. 57]

```
1  Q    I just want to clarify something.  You did say earlier
2  today -- you mentioned that Mr. Todd Henry had given some
3  advice to the -- you and your family members about this power
4  of attorney and the transfers.  Right?
5  A    Yes, sir.
6  Q    Now, that was at the time Mr. Henry was was -- was it
7  Mr. Imad Dawara's attorney?
8  A    Yes, sir.
```

[Albarouki TT p. 58]

62.    The Incarcerated Defendants have also intentionally co-mingled their assets with those of the other Defendants including proceeds of rents from the real estate. [Albarouki TT p. 45, l. 23 to p. 47, l. 1]. Mr. Albarouki specifically testified:

```
 2   Q     And do you collect the money for the one brother-in-law
 3   and your wife collects it for the other brother-in-law?
 4   A     From the second.
 5   Q     Okay.  And does all that money go into the same account?
 6   A     Yes, sir.
 7   Q     And do you make any distinction between one or the other?
 8   A     No, sir.
 9   Q     It's like a family account.
10   A     Exactly.
11   Q     You just use it for whatever family purpose.  Correct?
12   A     Husband and wife.
```

[Albarouki TT p. 47, l. 2 to l. 12].

63.    Incarcerated Defendants caused the Un-incarcerated Defendants to acquire and maintain title to the ten properties to be used by the Incarcerated Defendants personally either under circumstances where the Incarcerated Defendants did not receive any value or did not receive reasonably equivalent value, to avoid the possession of assets or cash that would be available to satisfy the obligations owed to Plaintiff.

**The Incarcerated Defendants Retained Control over Transferred Assets**

64.    For example, despite having transferred title to family members, the Incarcerated Defendants signed a Restitution Agreement with the Government that agreed to liquidate seven of the ten properties. The Agreement provided:

> (9)    The defendants agree to pay restitution as follows:
>
> (a)    By no later than 90 days after the date the Court sentences the first defendant, the defendants shall have jointly paid a total of $1 million that shall be deposited with the Clerk of Court and applied as partial payment for restitution. The defendants shall pay this amount as follows:

\*        \*        \*

(d)     To facilitate the payment of restitution, the defendants agree to liquidate the following real properties:

    (i)     134 Garfield Avenue, Woodlyn, Pennsylvania;

    (ii)    1524 McKean Street, Philadelphia, Pennsylvania;

    (iii)   321 Massasiot Street, Essington, Pennsylvania;

    (iv)    224 Erickson Avenue, Essington, Pennsylvania;

    (v)     1007 Milmont Avenue, Swarthmore, Pennsylvania;

    (vi)    142 Garfield Avenue, Woodlyn, Pennsylvania; and

    (vii)   312 Fern Street, Darby, Pennsylvania.

[Ex. P 5E1, pp. 213- 214]

65.     As of the date the Restitution Agreement was signed, October 27, 2020, a one-half interest in each of the seven properties had already been transferred to family:



[Ex P11, p. 510]

66.     The Incarcerated Defendants also agreed that the Government could theoretically go after all the properties, including the three properties that had been carved out of the sale obligation, should there be a breach of the Restitution Agreement:

> payment for restitution.
>
> (g)     Provided that the defendants remit all payments due under this agreement within the time prescribed above, the government's right to collect restitution shall not extend to the following properties:
>
>        (i)     19 Ridgeway Ave, Norwood, Pennsylvania;
>
> ──────────────────────────────────────────
>
> ase 2:19-cr-00414-JS   Document 69   Filed 02/25/21   Page 4 of 5
>
>                                 - 4 -                  **Pltf Trial Exhibits p. 215**
>
>        (ii)    305 Seminole Street, Essington, Pennsylvania; and
>
>        (iii)   407 Seminole Street, Essington, Pennsylvania
>
> In the event either defendant defaults with the payments set forth above, the defendants understand and agree that the government reserves its right to initiate action against these properties to collect restitution as provided under applicable federal or state law.

[Ex. P 5E1, pp. 214-215]

67.     This establishes that the transferors retained control over one-hundred percent of all the properties despite any transfers to the family – even over properties which they would soon transfer completely out of their names. Seven properties originally owned by the Incarcerated Defendants were dedicated to satisfying the one-million-dollar restitution obligation. The other three properties were transferred to family members not to avoid the restitution, but to avoid the creditors of the Incarcerated Defendants who had just prior to these transfers filed their motion for

summary judgment in the Philadelphia Case. As Mr. Albaruki testified [GARY – THIS EXCERPT WAS ALREADY USED, DO WE NEED TO RECYCLE IT AGAIN? MAYBE JUST DELETE THE HIGHLIGHTED PART]:

```
 4  Q    So you knew that the government wanted the seven
 5  properties.  You had a potential to save three properties --
 6  A    Yes, of course.
 7  Q    -- for the family.
 8  A    Yes.
 9  Q    So that's why you did it.
10  A    Yes, sir.  The government wants the seven houses, and we
11  still selling those houses to pay the -- the money back to the
12  government.
```

[Albarouki TT p. 55]

68.     The transfers were allegedly done on the advice of the attorneys for the Incarcerated Defendants pursuant to powers of attorney signed October 26, 2019. [Albarouki TT p. 62, l. 2 6to p. 63, 1. 23]

69.     The attorneys engaged to prepare the transfers and powers of attorney were paid for by the "family". [Albarouki TT Day 1 p. 65, l. 1-19]

70.     The entire process of transferring the properties away from the Incarcerated Defendants was pursuant to a grand plan or scheme that all defendants participated in.

### Defendants' Lack of Credibility

71.     In addition to the Incarcerated Defendants, who have been convicted of arson conspiracy, tax evasion, and healthcare fraud, other members of the Un-incarcerated Defendants have been found guilty of fraud and other misconduct as well. [Ex P5H p.240, Ex. P5I, p. 254, P8G, p. 439].

72.     Specifically, on December 18, 2020, Abeer Naim pled guilty before this Court to three counts of healthcare fraud and conversion of government funds in criminal case 2:20-cr-00391-JS-1 in the Eastern District of Pennsylvania. On June 8, 2021, Abeer Naim was sentenced by this Court to three years of probation. [Ex.P8G, p. 439, 440]

73.     The Incarcerated Defendants, even before their arrest, had a documented record of concealing and misrepresenting their assets, including placing assets in straw owners' names and dealing in large amounts of concealed cash. [Ex P5H p.240, Ex. P5I, p. 254]

74.     The Incarcerated Defendants have pled guilty to the crime of Conspiracy to Defraud the United States in Case 2:20-cr-00104-JS in relation to their misconduct in placing significant valuable assets in straw owners' names. [Ex P5H p.240, Ex. P5I, p. 254]

75.     By their admitted conduct in setting the Fire to the Chestnut Street buildings where their business was located, the Incarcerated Defendants also have a proven record of intentionally destroying their own valuable property. [Ex P5H p.240, Ex. P5I, p. 254]

76.     After their arrest, the Incarcerated Defendants did not cease their misconduct, but doubled down on it by engaging in further fraudulent transfers that are facially obvious from Ex.P.7 and the Exhibits 1-10 attached to Ex.P8A. Their pattern of placing assets in the names of others has continued and evidences an ongoing scheme. [Ex.P.7 and p8A]

77.     The transfers of Properties in which the Incarcerated Defendants had an interest to members of the Non-incarcerated Defendants were made after February 18, 2018. [Ex.P.7]

**Incarcerated Defendants received no value in exchange for the transfers**

78.     The Incarcerated Defendants received no value or insufficient value in exchange for each of said transfers. [Ex.P.7]

79.     As a creditor of the Incarcerated Defendants, CSC was detrimentally affected. [Ex.P1C, P7]

**Incarcerated Defendants' Resulting Financial Condition**

80.     At the time of the transfers, the Incarcerated Defendants were insolvent, or became insolvent, because of the transfers. At the time, they were not paying their debts as they became due, including rent that was due to Fresher Start. [Ex.P.5B, pp. 195-196, P5C, P5D, P5G p. 236]

81.     At the time of each of the transfers, the Incarcerated Defendants were engaged in a transaction, or were about to engage in a transaction, for which capital remaining with the transferor was unreasonably small. Ex.P.5A-J,7, 8A-F.

82.     At the time of each of the transfers, the Incarcerated Defendants intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured. Ex.P.5A-J,7, 8A-F.

**Purported Defenses: Lease Purchase Not Credible Transactions**

83.     In defense of the avoidance action, the Un-incarcerated Defendants provided unnotarized and unrecorded lease purchase agreements for 407 Seminole and 305 Seminole, both of which are dated August 31, 2015. They argue that the transfers of these two properties in 2019-2021 were done pursuant to the terms of the agreements. The clear language of the agreements belies the credibility of the Defendants' witnesses, as does common sense.

84.     The purported lease purchase for 407 Seminole to Mirvat Dawara provided:

(2)      **TERM:** The term of this Lease/Option shall be for a period of __1__ months commencing on ___9___ ,20 _15_ ,and ending on __2045__ The term will be automatically extended for _____ periods of _____ months, unless the Tenant/Buyer gives notice to the Landlord/Seller of its intent to terminate this Lease/Option, by mailing a written notice to the last provided address of the Landlord/Seller. Liability for payment will not extend beyond notice to terminate this agreement. Possession shall be given to Tenant/Buyer on _____

(3)      **RENT:** Tenant/Buyer agrees to pay to the Landlord/Seller, the sum of $ _1200_ per month, with the first payment beginning _9/10 o15_ as rent for the property, for the term of this Lease/Option, and during any extensions thereof. All rental payments shall be due and payable in advance on the 10th day of each and every month. An amount equal to $ _1200.00_ for each month in which rent was paid, shall be credited to the Tenant/Buyer and applied to the purchase price of the property in the event that the Tenant/Buyer exercises its option hereunder; otherwise, this credit shall be non-refundable and considered forfeited if the option is not exercised.

(4)      **OPTION TO PURCHASE:** The Tenant/Buyer, as part of the consideration herein, is hereby granted the exclusive right, option and privilege of purchasing property at any time during the term of this Lease/Option agreement or any extension thereof. The Tenant/Buyer shall notify the Landlord/Seller in writing of the exercise of this option at least ten (10) days prior to the expiration of the initial term of this Lease/Option or the expiration of any extension thereof, by mail to the last-provided address of Landlord/Seller.

**OPTION TO PURCHASE TERMS**

**(14) PRICE AND TERMS:** The Tenant/Buyer agrees to pay for said property the sum of $_____ less any sums for which the Tenant/Buyer is entitled to claim reimbursement or offset in accordance with this agreement; the net sum to be paid in cash, certified check, or cashiers check at closing.

[Ex. D2B]

85.     The document is silent as to the price to be paid for the purchase of the property.

86.     The clear terms of the document provided by the Un-incarcerated Defendants [Ex. D2B] do not support their position that the transfers to 407 Seminole to Mirvat Dawara in late 2019 (50%) and (50%) in April 2021 was consistent with the document or for any value.

87.     The exercise of the purchase option required written notice. No written notice was ever provided. [Albarouki TT p. 48, l. 3-13]

88.     No sum was paid under the purchase option – the only payments made were rental installments made under the lease portion of the agreement. [Albarouki TT p. 49, l. 3-15; Mirvat Dawara TTD2, p. 47, l. 12-16]

89.     Mirvat Dawara testified that the terms were set forth in the written contract [Mirvat Dawara TTD2, p. 47, l. 8-11] She did not know why her brother provided a deed to her in 2019.

[Mirvat Dawara TTD2, p. 44, l 25 to p. 45, l. 2] She did not make any payments to her brother in 2019 or 2021 when the deeds were transferred to her. [Mirvat Dawara TTD2, p.47, l. 9 – 21]

90.    The purported lease purchase for 305 Seminole to Maisaa Dawara provided:



[Ex. D2A]

91.    The exercise of the purchase option required written notice. No written notice was ever provided. [Albarouki TT p. 48, l. 6-13]

92.    No sum was paid under the purchase option – the only payments made were rental installments made under the lease portion of the agreement. [Albarouki TT p. 51, l. 7 to p. 52 l. 2; Mirvat Dawara TT D2 p. 38, l. 12-13]

93.    The Defendants only introduced proof of payments of the lease obligation in the agreement, i.e. $1,100 per month for several years. No proof of any payment of $1,100 per month for a 30-year period as set out in the option terms was introduced.

34

94.     When asked about the specific purchase terms, Imad Dawara, the owner of the properties and the person who drafted the documents, had no memory except the self-serving recollection that the payments under the agreement had been made.

```
15          Q.      Do you remember what that amount was?
16          A.      No, I don't.
17          Q.      Do you remember how long you gave them
18   to pay the amount?
19          A.      I don't remember.
20          Q.      Do you remember how much they were
21   required to pay per month under the agreement?
22          A.      I don't remember.
```

Imad Dawara DT, p. 61

```
1           A.      Well, I don't remember exactly but they
2    were paying checks until they finished the payments
3    they were supposed to pay.
4           Q.      And after you were arrested, who did
5    the checks go to?
6           A.      I really don't remember.
7           Q.      Did your wife -- at the time you were
8    arrested, did your wife have a bank account?
9           A.      Yes.
10          Q.      Was your wife permitted to receive
11   those checks?
12          A.      I really don't remember.
```

Imad Dawara DT, p. 63

```
 1          Q.     And do you know who they paid?
 2          A.     I don't remember.
 3          Q.     Were you aware that there were checks
 4    written to your wife from Omar and Mirvat after you
 5    were incarcerated?
 6          A.     Could be.
 7          Q.     Do you know what your wife may have
 8    done with those checks?
 9          A.     I'm sure put it in the bank account.
10          Q.     Do you know if Haitham Albarouki
11    received any of those checks?
12          A.     I don't remember.
```

Imad Dawara DT, p. 68. In fact, during a deposition lasting only approximately 2-3 hours, Imad Dawara testified that he could not remember over 125 times.

95.    Maisaa Dawara testified that she did not read English [Maisaa Dawara D2T, p. 12. l. 6-14] but that she thought the purpose of the lease purchase agreement was to show school officials proof that she lived at the address. [Maisaa Dawara D2T, p. 13. l. 7-21] She trusted her brother. [Maisaa Dawara D2T, p. 24, l. 8-11] Her testimony about the contract is inconsistent with the terms of the contract. [Compare Maisaa Dawara D2T, p. 15. l. 11-22 with Ex.D2A]

96.    There are many reasons to find the testimony of Maisaa and Mirvat Dawara to the effect that they purchased the two properties unbelievable. First, their testimony is inconsistent with the terms of the lease purchase agreements. Second, their testimony is self-serving and an obvious attempt to shield these properties from their brothers' creditors. Third, Maisaa Dawara

testified she did not read English but her brother testified that she did. Fourth, they were unable to provide an explanation regarding the timing of transferring fifty percent of the properties in 2019 just after the brothers were arrested and then 50 percent in 2021 after sentencing. Fifth, had the properties indeed belonged to Maisaa and Mirvat, their Incarcerated Defendant brothers could not have contracted to sell these properties for purposes of satisfying restitution in case of default under the restitution agreement – such obligation would require Maisaa and Mirvat Dawara's signatures. Finally, even if their testimony were true and they did have an option to purchase, no "purchase" of these properties took place: the total amount they paid for residing at the two properties falls short of the properties' fair rental, let alone compensate the seller for any value exchanged at the time of transferring title to the properties.

97.    Imad Dawara testified that the payments for purchase of the two properties had been received in full but he was unable to remember any details about the transactions including price, timing of payments or when the final payment was made. [Imad Dawara DT, p. 61]

98.    The defendants' prior similar fraudulent acts demonstrate that the fraudulent transfers currently before the court were done knowingly and willfully, and not accidentally or innocently.

99.    The defendants' testimony lacks plausibility when compared to other evidence in the case including the actual terms of the purported lease purchase options, the timing of transfers and stepped manner of transferring the property. In sum, the defendants' testimony is not corroborated by the other evidence in this case and must be disregarded.

**Purported Defenses: Lease Purchase Not Reasonable Equivalent Value**

100.    The U.S. Department of Housing and Urban Development Office of Policy Development and Research provides annual determinations of fair market rents, defined as gross

rents (which include the cost of shelter plus utilities) in its Market Rent Documentation System for Delaware County Pennsylvania, the area in which 407 Seminole (4 bedrooms) and 305 Seminole (3 bedrooms) are located. [Ex. P10J, p. 486; Ex. P10K, p. 489-90]

101.    The Fiscal Year 2015 Market Rent Documentation System indicates that the rental value of 407 Seminole was $1,546 and that the rental value of 305 Seminole was $1,440. [Ex. P10J, p. 486; P10A, p. 453]

102.    The Fiscal Year 2018 Market Rent Documentation System indicates that the rental value of 407 Seminole was $1,787 and that the rental value of 305 Seminole was $1,587. [Ex. P10D, p. 465]

103.    The monthly rental value of 407 Seminole from the date the liability was triggered by the arson fire (2/18/2018) to date ranges from $1,787 to $1,837. [Ex. P10D, p. 465, P10H, p. 481]

104.    The monthly rental value of 305 Seminole from the date the liability was triggered by the arson fire (2/18/2018) to date ranges from $1,587 to $ 1,605. [Ex. P10D, p. 465, P10H, p. 481]

105.    Since the leases were both below market even in rental value, no value was or possibly could have been exchanged for the stepped transfers of title of 50% in 2019 and 50% in 2021.

### The $1,000,000 Restitution Obligation Has Been Fulfilled or Will Inevitably be Fulfilled from the Sale of Seven Properties

106.    Despite having already transferred 50 percent interests in ten properties to other family members, the Incarcerated Defendants entered into their respective Restitution Agreements whereby they agreed to sell or arrange to sell seven of the ten properties to fulfill their restitution obligation. [Ex. P5E1, p. 214]

107.    Seven properties originally owned by the Incarcerated Defendants were dedicated to satisfying the one-million-dollar restitution obligation. [Albarouki TT p. 55]

108.    The Incarcerated Defendants also agreed that the Government could go after the three properties that had been carved out of the sale obligation, but only if there is a breach of the Restitution Agreement. [Ex. P 5E1, pp. 214-215]

109.    The one-million-dollar obligation owed under the restitution agreement is nearly satisfied in full. [Bahaa TT p. 32, l.1-8] Moreover, the value of the remaining unsold properties is more than adequate to fulfill all of the obligations of the Incarcerated Defendants.

110.    Even if hypothetically the $1,000,000 restitution threshold is not reached after all Pending Properties are sold, the Court can fashion a clawback remedy for the difference operating against CSC, whereby CSC would have to escrow a portion of the proceeds from the sale of the Subject Properties that would be sufficient to cover any shortfall to the $1,000,000 (CSC is also prepared to post a cash bond for this purpose).

## PROPOSED CONCLUSIONS OF LAW

### Jurisdiction, Venue and Applicable Law

111.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because this action involves a dispute between parties deemed citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

112.    To the extent permitted by law, this Court has supplemental jurisdiction over certain claims pursuant to 28 U.S.C. § 1367.

113.    Venue is properly laid in this judicial district pursuant to 28 U.S.C. § 1391 because the events giving rise to Plaintiff s claims occurred in the Eastern District of Pennsylvania, and because, at the time suit was commenced, all of the Defendants resided in the Eastern District of Pennsylvania.

114.    Pennsylvania law, including the Pennsylvania Uniform Voidable Transfer Act ("PUVTA"), 12 P.S. § 5101, et seq., applies to the conduct of these Pennsylvania citizen defendants because all the transactions at issue occurred in Pennsylvania.

115.    Sitting in diversity, the Court applies Pennsylvania rules. *Security Mutual Life Insurance Company of New York v. Contemporary Real Estate Associates*, 979 F.2d 329, 331-332 (3d Cir. 1992) (citing *Montgomery Ward & Co. v. Pacific Indemnification Company*, 557 F.2d 51, 56 (3d Cir. 1977)).

116.    Pennsylvania law also applies because when a prior case has been adjudicated in a state court, federal courts are required by 28 U.S.C. § 1738 to give full faith and credit to the state judgment and apply the same preclusion rules as would the courts of that state. See, e.g., *Edmundson v. Borough of Kennett Square*, 4 F.3d 186, 189 (3d Cir. 1993); *Randall*, 358 B.R. at 164; *In re Vitanza*, 1998 WL 808629, at *10 n.24 (Bankr. E.D. Pa. Nov. 13, 1998).

**Voidable Transfers**

117.    CSC brings this action under the Pennsylvania Uniform Voidable Transfer Act ('PUVTA'), 12 P.S. § 5101, et seq. *In re Roman Catholic Diocese of Harrisburg* (Bankr. M.D. Pa. 2022)CSC's claims are based, alternatively, on the actual fraud provision of the Act, 12 P.S. § 5104(a)(1), and the constructive fraud provision, § 5104 (a)(2).

**Actual Fraud**

118.    The claim that the transfers constitute actual fraud on the part of the Incarcerated Defendants is based on the provisions set forth in § 5104 of the Act which states, in pertinent part:

> (a) General rule.-- A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>> (1) with actual intent to hinder, delay or defraud any creditor of the debtor; 12 P.S. § 5104(a)(1).

119.    Because there is no dispute over whether the transfers were made, the Court proceeds directly to the evidence bearing on the state of mind of the Incarcerated Defendants.

120.    Since "individuals are rarely willing to admit intent, actual fraud is rarely proven by direct evidence." *In re Pennsylvania Gear Corp.*, 2008 WL 2370169, at *9 (Bankr.E.D.Pa. April 22, 2008).

121.    In this case, the clear import of the testimony of Mr. Albarouki, who acted at the center of the "family", establishes actual intent of the entire family of defendants. He and his wife acted with powers of attorney to protect the three properties carved out from the sale requirement of the Restitution Agreement from falling into the hands of the Incarcerated Defendants' creditors.

122.     As agent for the Incarcerated Defendants, the testimony and acts of Mr. Albarouki and his wife establish the actual intent of the Incarcerated Defendants to .

123.     In addition, there are factors, commonly referred to as "badges of fraud," which courts consider in determining whether fraud has been proven by circumstantial evidence. *Holber v. Dolchin Slotkin & Todd, P.C. (In re American Rehab & Physical Therapy, Inc.)*, 2006 WL 1997431, at *15 (Bankr.E.D.Pa. May 18, 2006).

124.     The Act provides a non-exhaustive list of such factors for use in determining whether "actual intent" exists (badges of fraud). In determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether:

     (1)   the transfer or obligation was to an insider;

     (2)   the debtor retained possession or control of the property transferred after the transfer;

     (3)   the transfer or obligation was disclosed or concealed;

     (4)   before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

     (5)   the transfer was of substantially all the debtor's assets;

     (6)   the debtor absconded;

     (7)   the debtor removed or concealed assets;

     (8)   the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

     (9)   the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. 12 P.S. § 5104(b).

125.    "'Although the presence of a single . . . badge of fraud may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud.' *In re AgFeed USA, LLC*, 546 B.R. 318, 337 (Bankr. D. Del. 2016)." *In re Roman Catholic Diocese of Harrisburg* (Bankr. M.D. Pa. 2022).

126.    Courts differ on how to apply these "badges." Compare *In re Valley Bldg. & Const. Corp.*, 435 B.R. 276, 285 (Bankr.E.D. Pa. 2010) (requiring a finding of "goodly" number of these factors to establish fraudulent intent) with *In re Cohen*, 142 B.R. 720, 728 (Bankr.E.D.Pa.1992) (stating that a "strong finding" as to just one badge will suffice); see also *In re Cook*, 126 B.R. 261, 269 (Bankr.E.D.Tex. 1991) quoting *In re: Penner* , 107 B.R. 171, 176 (Bkrtcy.N.D.Ind.1989) (stating that just one factor can support a finding of fraud and that "[t]he accumulation of several factors can lead inescapably to the conclusion that the debtor possessed a requisite intent.")

127.    A leading commentator explains that "[w]hatever badges of fraud a court uses, no particular badge is necessary, nor is any combination sufficient. The matter is always factual—the presence of badges of fraud permits but does not compel a finding of actual intent." 5 *Collier on Bankruptcy* ¶ 548.04[1][b][ii].

128.    The analysis entails more than just totaling up the number badges for which evidence is adduced. This may be due, in part, to the disparate nature of the factors.

129.    Some of the badges are themselves indicative of concealment, deception or fraudulent intent:

2.  The debtor retained possession or control of the property transferred after the transfer;

3.  The transfer or obligation was ... concealed;

6.  The debtor absconded; and

7.  The debtor removed or concealed assets.

130.   One category of badges of fraud consists of three of them that do not implicitly suggest fraud but do suggest there must have been a motivation other than the transaction itself because it was not an economically rational decision for a debtor to make but for its effect to hinder or delay creditors:

1.  The transfer or obligation was to an insider;

8.  The value of the consideration received by the debtor was [not] reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

11. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

131.   Another category, however, consists of badges that may be innocent in themselves, or are merely timing factors that become suspicious only when combined with other factors:

4. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

5. The transfer was of substantially all of the debtor's assets;

9. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; and

10. The transfer occurred shortly before or shortly after a substantial debt was incurred.

44

*Crater* , *supra* , 286 B.R. at 764–65 ; See also *In re Glunk* , 342 B.R. 717, 733 (Bankr.E.D.Pa.2006) (adopting the *Crater* analysis).

### Direct Indications of Fraudulent Intent

132.    From the first category of badges of fraud, two badges exist: the Incarcerated Defendants retained control of the property even after having transferred it and some of the transfers were concealed by intentionally misspelling the names of the transferees to make tracing the transfers in public records difficult.

133.    The Incarcerated Defendants transferred real estate to family members. Despite the transfers, the Incarcerated Defendants' filings and arguments in this case reflect that they continue to control these properties and intend to use them as they please including possibly as part of their restitution obligations. This continued control of the property is a strong indication of fraud. See *In re Spitko* , 357 B.R. 272, 302 (Bankr.E.D.Pa. 2006) quoting *Matter of Hughes* , 184 B.R. 902, 908 (Bankr.E.D.La. 1995) ("[t]he retention of the use of transferred property very strongly indicates a fraudulent motive underlying the transfer.").

134.    From the intentional misspellings of names on documents of transfer, the court infers that no corrections were made to make it difficult to trace the ownership of these assets to the transferors who still maintain an element of control.

### Implicit Suggestions of Fraudulent Intent

135.    Two badges of fraud exist in the facts under the implicit suggestion of fraudulent intent category: that the transfer was to an insider, and that in exchange for what was transferred, reasonably equivalent value was not paid.

136.    The Act's definition of "insider" is derived from the Bankruptcy Code. See 12 P.S. § 5101, Comment 8. The Code defines "insider" to include relatives. See 11 U.S.C. §

101(31)(A)(i). The term "relative" is, in turn, defined to include an "individual related by affinity..." 11 U.S.C. § 101(45). That, of course, would include the Incarcerated Defendants'' spouses and siblings.

137.    But just as probative as to fraudulent intent is the absence of consideration paid. The numerous deeds which memorialize the several transfers recite that in exchange for the real estate the transferees paid $1. Where a debtor transfers property without, or for nominal, consideration, a rebuttable presumption of fraud arises. *In re Kenned* , 566 B.R. 690, 710 (Bankr. D.N.J. 2017). Transfers between relatives are "carefully scrutinized." *In re Horob Livestock, Inc*., 382 B.R. 459, 488 (Bankr.D.Mont. Dec. 17, 2007). See also *In re Lang*, 246 B.R. 463, 470 (Bankr.D.Mass.2000) ("[m]ost courts agree that when a debtor transfers property gratuitously or to relatives in the shadow of a bankruptcy filing, a presumption of fraudulent intent arises") (citing cases); *In re Chastant* , 873 F.2d 89, 91 (5th Cir.1989) ("a presumption of actual fraudulent intent necessary to bar a discharge arises when property is either transferred gratuitously or is transferred to relatives.")

138.    The unnotarized and unrecorded lease purchase agreements for 407 Seminole and 305 Seminole, both dated August 31, 2015, reflect monthly payments that have a total value far below the monthly rental value for those properties.

139.    Because it appears from the record that the transfers were both to insiders as well as gratuitous or nearly so, these factors strongly indicate fraud on the Incarcerated Defendants' part.

### Probative Value Based on Circumstances

140.    From the third and final category of fraud badges, all four are established by the record in this case.

141.    Before the Incarcerated Defendants made the transfers, they had already committed the criminal act that would lead to their liability, had already been arrested, and were aware that they would face financial consequences as a result of it. As the timeline illustrates, the transfers are each tied tightly in time to key events that heightened the awareness of the Incarcerated Defendants that their assets were in jeopardy of attachment for a civil judgment. That tight amount of time makes it a strong indication that the transfers necessarily occurred in response to the likelihood of civil responsibility to the predecessors in interest of CSC.

142.    Next, the transfers were of "substantially all the Incarcerated Defendants' assets (there were no remaining assets after the transfers). At the time of the fire, the Incarcerated Defendants were about to be evicted from the premises of the fire. The fire was started to recover insurance money to bolster their finances. The subsection of the PUVTA tests whether a transfer leaves the debtor with unreasonably small assets to sustain its operations. The subsection (i) test does not require insolvency. Instead, the analysis looks at whether the transferor's financial failure was reasonably foreseeable. See *Peltz v. Hatten*, 279 B.R. 710, 744, (D. . 2002), *citing Moody, vs. Security Pacific Business Credit, Inc*., 971 F.2d 1056, 1073 (3d Cir. 1992), where the court states that the test for unreasonably small capital is reasonable foreseeability.

143.    Section 5101(b) of the PUVTA provides definitions for the statute, including a definition of the term "asset", which it defines broadly as property of the debtor. However, §5101(b) excludes from the definition property to the extent that it is encumbered by a valid lien. Thus, if a debtor owns property that is completely encumbered by liens, that property is not considered an asset of the debtor under §5101, or if that property is only partially encumbered, then §5101 dictates that only the unencumbered portion of the property will be considered an asset of the debtor. The net effect of this provision is to exclude property interests that are beyond the

reach of unsecured creditors from the definition of asset for the purpose of these provisions. See 12 Pa.C.S. §5101 committee comment #2 (1984). Thus, the mortgage on 19 Ridgeway does not remove that property from the claw back under the PUVTA to the full value of the unencumbered portion.

144.     The third factor considers the Incarcerated Defendants' financial condition when they made the transfers or the effect that the transfers had on their financial situation. The timeline of facts establishes that as the Incarcerated Defendants became aware that they were caught and would face significant liability, they transferred assets of significant values in their names away to family members to divert them from the reach of the ultimate judgment of CSC.

145.     The fourth factor highlights the timing of the transfers relative to the Incarcerated Defendants awareness that they had been caught and faced substantial liability to CSC.

### Assessment of the Proofs as to Actual Fraud

146.     The evidence establishes that the Incarcerated Defendants even today assert control of the real estate (albeit with spouses and family members) after having conveyed it to the family group. For example, they argue that the assets transferred away are still somehow subject to the restitution judgment. If they cannot succeed in controlling these assets in the hands of family members, they would prefer that the assets be diverted to the government to ease their incarceration.

147.     However, it is from the second group, conduct which implicitly suggests fraud, that the evidence of fraudulent intent is glaring: the transfers were all made to an insider and for essentially no consideration. Indeed, this is the archetypical fraudulent transfer: to a relative and for no consideration. See I*n re LXEng, LLC*, 607 B.R. 67, 92 (Bankr.D.Conn. 2019) (stating that transfer of property to spouse as classic badge of fraud); *In re Roti*, 271 B.R. 281, 297

(Bankr.N.D.Ill. 2002) (citing as classic example of actual fraud debtor's placing of asset in name of insiders, under his control and direction, and to frustrate creditor's collection efforts); *In re Collins* , 540 B.R. 54, 60 (Bankr.E.D.N.Y. 2015) (listing transfer to spouse while retaining use of transferred property as classic badge of fraud); *In re Gipe* , 157 B.R. 171, 177 (Bankr.M.D.Fla. 1993) (listing amount factors indicating classic, orthodox fraudulent transfer the existence of a family relationship and the lack, or inadequacy, of consideration). So while those two indications are somewhat supported by other factors, they are enough to meet CSC's threshold burden of proving that the Incarcerated Defendants' transfer of their real estate to family members for $1 is actual fraud under the PUVTA.

### Punitive Damages for Actual Fraud

148.    Plaintiff asks the court to award punitive damages against all defendants due to the egregious nature of these fraudulent transfers and the overall scheme. [Mogilyansky TT Day 1 p. 89, l. 9 to 10] Considering the history of the defendants' disregard of the law lack of remorse and egregious conspiracy to deprive the victims of recovery, the severest penalties are appropriate in this case. [Mogilyansky TT Day 1 p. 69, l. 19 to p. 70 l. 23]

149.    The transfers of the properties were performed in an outrageous fashion by the Un-incarcerated Defendants. Section 7(a)(3)(iii) of PUVTA allows a court to award "any other relief the circumstances may require." This Court has previously interpreted the same clause in PUFTA, a predecessor law to PUVTA, to allow an award of punitive damages in especially egregious cases of fraudulent conveyance[6]. The case of Incarcerated Defendants and their relatives conspiring to

---

[6] See, Klein v. Weidner (ED Pa Feb. 17, 2010),
https://www.casemine.com/judgement/us/5914b0d8add7b04934755579, *affirmed* Klein v. Weidner, 729 F.3d 280 (3rd Cir. 2013). PA UVTA, which is a revision of PUFTA, has not altered the pertinent language of Section 7(a)(3)(iii).

delay victims of arson from civil recovery and conceal property from the in a manner described in this Complaint is at the upper end of the range of egregious violations of the PUVTA.

150.    The evidence, in light of the various factors set forth in 12 Pa.C.S.A. §5104, weighs heavily in favor of a determination that Defendants intentionally acted in concert to defraud Plaintiff through the transfer of the ten properties, thus necessitating (1) a recission of the transfers of the three properties; (2) pursuant to 12 Pa.C.S.A. §5107, the appointment of a receiver to move forward with the sale of the three properties to allow Plaintiff to recover a portion of the judgment it holds against these parcels of real estate; (3) an injunction should be issued to bar the further transfer, encumbrance, or disposition of the three parcels.

151.    When a creditor establishes that a fraudulent transfer was made, "the creditor may, *inter alia*, avoid the transfer or obligation, attach the transferred assets or other property of the transferee, obtain an injunction barring further transfers, or seek appointment of a receiver over the transferred asset." *Milton Roy, LLC v. Ne. Pump & Instrument, Inc*., 2019 WL 2469795, at *4 (E.D.Pa. June 13, 2019) (citing *K-B Bldg. Co. v. Sheesley Constr., Inc*., 833 A.2d 1132, 1135-36 (Pa. Super. Ct. 2003)); 12 Pa.C.S.A. §5104(c).

152.    The Incarcerated Defendants here fraudulently transferred no less than ten parcels of real estate to family members with the intention of avoiding their civil liability obligations to CSC resulting from the intentional tort of arson. They took additional actions to prevent and delay CSC from obtaining a judgment and continued with delays to attempt to put all of their assets beyond the reach of CSC.

153.    Judgments and applications for damages against transferees are available under the PUVTA as the section concerning the "remedies of creditors" contains a "catch-all" provision

expressly providing that a creditor may obtain "any other relief the circumstances may require." Klein, 729 F.3d at 286-88 (quoting 12 Pa.C.S.A. §5107).

154.    An award of punitive damages against all the Defendants is proper for their complete and utter disregard for the rights of others and to deter them and others from similar flagrant conduct. While there is no "bright-line ratio" for courts to apply in calculating punitive damages, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Campbell*, 538 U.S. at 425 (finding a ratio of 145:1 to violate Due Process and explaining that, historically, double, treble, or quadruple damages are used to deter).

155.    CSC leaves it to the court to decide whether a punitive damages award at a ratio of 1:2. 1:3 or 1:4 is appropriate to deter future tortious misconduct.

156.    Plaintiff is entitled to a judgment: (a) avoiding and preserving the transfers, (b) directing that the transfers be set aside, (c) recovering the transfers, or the value thereof, from the Defendants for their sole benefit, and (d) punitive damages.

157.    The Third Circuit Court of Appeals interpreted the catch-all remedy provision found in 12 Pa.C.S.A. § 5107(a)(3)(iii), which states that a creditor may obtain "any other relief the circumstances require," to be broad enough to mean that punitive damages would be permissible under the PUFTA. Klein, 729 F.3d at 290-91.

158.    The evidence here establishes that (1) a defendants had a subjective appreciation of the risk of harm to which plaintiff was exposed and that (2) they acted in concert in conscious disregard of that risk.'" *Norfolk Southern Railway Co. v. Pittsburg & W.Va. R.R.*, 153 F. Supp. 3d 778, 817 (W.D. Pa. 2015) (quoting *Hutchinson*, 870 A.2d at 772). The defendants acted with a culpable state of mind, i.e., with evil motive or reckless indifference to the rights of others." *Brand*

*Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.*, 801 F.3d 347, 360 (3d Cir. 2015) (quoting

*Hutchinson v. Penske Truck Leasing Co.*, 876 A.2d 978, 983-84 (Pa. Super. Ct. 2005)).

**Constructive Fraud**

159.    Alternatively, CSC seeks to avoid and recover the transfers of the Incarcerated

Defendants' real estate as instances of constructive fraud. In that regard, the PUVTA provides:

> (a) General rule.-- A transfer made or obligation incurred by a debtor is
> voidable as to a creditor, whether the creditor's claim arose before or after
> the transfer was made or the obligation was incurred, if the debtor made the
> transfer or incurred the obligation:
>
> ...
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer
> or obligation, and the debtor:
>
>> (i)  was engaged or about to engage in a business or transaction for
>> which the remaining assets of the debtor were unreasonably
>> small in relation to the business or transaction; or
>>
>> (ii) intended to incur, or believed or reasonably should have
>> believed that the debtor would incur, debts beyond the debtor's
>> ability to pay as they became due. 12 P.S. § 5104(a)(2).

**Lack of Reasonably Equivalent Value at the Time of the Transfer**

160.    The Third Circuit has set forth a two-pronged analysis for determining if a

transferee furnished reasonably equivalent value: first, the transferee must have given some

"value;" and second, if value was given, it must be reasonably equivalent to what the debtor gave

up. See I*n re R.M.L., Inc.,* 92 F.3d 139, 149 (3d Cir. 1996).

161.    As an initial matter, on the question of whether any value was received, the court

must consider the transaction paperwork including the deeds which each recite total consideration

of one dollar ($1). The Un-incarcerated Defendants admit that the consideration for each deed was as stated in the deed: $1.00.

Complaint:

> 39.    Since the arson on February 18, 2018 that gave rise to Plaintiff's claims, and particularly shortly after the arrest of the Dawara Arsonists on October 16, 2019, the Dawara Conspiracy Group engaged in the following well-orchestrated fraudulent transfers of at least ten (10) real estate properties (the "Properties") with approximate market value of $2,797,000[5], some transferred multiple times, diverting these valuable assets away from the Dawara Arsonists' names to the names of others in the Dawara Conspiracy Group, in each instance for a nominal consideration of $1:

Answer:

> 39.    Admitted in part, denied in part.  By way of further response, the transfer of properties speak for themselves.  All deeds are documents of public record. Defendants' dispute the properties were transferred as part of a "well-orchestrated fraudulent transfer" or that each property was transferred "multiple times".  Defendants are unaware of the market values of the properties.

[Ex p8A, p. 372, P8C, p. P8G, p. 439]

162.    Despite their judicial admission that the transfers were each for one dollar, the Un-incarcerated Defendants maintain that value has been furnished by installment payments paid to the Incarcerated Defendants over a period of time. As such, they explain that they provided value for the property over a period of time. Even assuming this is true, what matters is the timing of exchange of that purported value. Reasonably equivalent value must be exchanged at the same time that the Incarcerated Defendants transferred the property. See, *Klein v. Weidner,* 2010 WL

27910 (E.D.Pa. Jan. 6, 2010) *aff'd*.729 F.3d 280 (3d Cir. 2013), *In re Viscount Air Services, Inc.*, 232 B.R. 416, 435 (Bankr.D.Ariz. 1998); *In re Parajo Dunes Rental Agency, Inc.*, 174, B.R. 557, 578 (Bankr. N.D. Cal. 1994); *In re Gluth Bros Constr. Inc.*, 424 B.R. 368, 375 (Bankr. N.D. Ill, 2009); *In re M. Fabrikant & Sons, Inc.*, 2009 WL 3806683, at \*13 (Bankr.S.D.N.Y. Nov. 10, 2009); In re Mercury Companies, Inc., 2014 WL 1316163, at \*8 (Bankr.D.Colo. Mar. 31, 2014) *vac'd on other grounds* , 527 B.R. 438 (D.Colo.2015).

163.    As such, the purported monthly contributions may not be considered in determining reasonably equivalent value. The exchanges here were not supported by reasonably equivalent value.

### Incarcerated Defendants' Resulting Financial Condition

164.    The record also establishes that the transaction had a detrimental financial effect on the Incarcerated Defendants. 12 P.S. § 5104(c). CSC has carried its burden of proof in two ways: the transfers left the Incarcerated Defendants with unreasonably small assets as compared to what was transferred (§ 5104(a)(2)(i)), or the Incarcerated Defendants intentionally incurred, or should have believed that they would incur, debts beyond their ability to pay (§ 5104(a)(2)(ii)). Subsection (a)(2)(i) envisions the Incarcerated Defendants being left in a state "short of equitable insolvency" as a result of the transfer. See Moody v. Security Pacific Business Credit , Inc. , 971 F.2d 1056, 1069 (3d Cir.1992). Subsection (a)(2)(ii) refers to the Incarcerated Defendants' resulting inability to generate sufficient profits to sustain operations. See In re Rocky Mountain Holdings, Inc. , 782 F.Supp.2d 106, 118 (E.D.Pa.2011).

165.    The record establishes the Incarcerated Defendants' poor financial condition at the time of the transfers. The Incarcerated Defendants were already unable to pay their rental

obligations for their business when they became due and committed a crime in an effort to obtain money but instead resulted in liability in tens of millions of dollars prior to all the transfers at issue.

166.    Although there is no balance sheet, income statement, tax return, or bank statement for the relevant time period, the Court determines that the financial effect the transfers had on the Incarcerated Defendants financial condition was such that they depleted the Incarcerated Defendants assets to the detriment of CSC – their creditor.

## Defenses

## The Restitution Obligation is Not a Defense

167.    Defendants seem to believe that because seven of the ten transfers were of properties that were ultimately sold or will be sold to satisfy the obligations of the Incarcerated Defendants under a restitution agreement with the government, that all the transfers from the Incarcerated Defendants to the Un-incarcerated Defendants are somehow insulated from avoidance. They cite no authority for their position. None is to be found.

168.    First, to the extent a transfer is avoidable, a judgment may be entered against "the **first transferee** of the asset or the person for whose benefit the transfer was made," among other parties. S*chwartzman v. Rogue Intern. Talent Group, Inc.*, 2014 WL 4055833, at *2 (E.D.Pa. Aug. 13, 2014). What that first transferee does with the asset short of turning it over to the court or the plaintiff is irrelevant to the cause of action.

169.    *Second, restitution does not affect CSC's civil remedy.*

170.    *Restitution is a form of restorative justice. The supporting theory is that it is intended to restore the victims of crime to the position they found themselves in prior to a defendant's commission of the offense that caused the injury or damage. Although part of the criminal sentence, restitution is intended to fairly compensate the victims of crime who suffered*

*an injury or damage rather than the government. Restitution and its recovery, however, is entirely out of control of the victims. As here, the government may negotiate restitution to obtain a plea agreement. Federal law considers the defendant's "economic circumstances" as a factor. Moreover, the federal court may consider numerous factors all out of control of the victims such as circumstances which would render a plan of restitution unworkable. See, 18 U.S.C. 3663.*

171.   *The procedures for determining payment and the amount of restitution vary in federal and state jurisdictions. In Pennsylvania*, the right to impose restitution is statutorily grounded in two provisions, 42 Pa.Con.Stat.Ann. §9721(c) and 18 Pa.Con.Stat.Ann. §1106(a). *Commonwealth v. Keenan*, 2004 PA Super 232 (PA 6/18/2004), 2004 PA Super 232 (Pa. 2004).

*172.*   Since *restitution is not the equivalent or the same as a civil damages award, it does not bind the victims who are entitled to recover from the criminal defendants under tort law. Pennsylvania courts note that an order of restitution is not an award of damages. While the restitution order aids the victim, its true purpose, and the reason for its imposition, is the rehabilitative goal it serves by impressing upon the offender the loss he has caused and his responsibility to repair the loss as far as it is possible to do so. Com. v. B.D.G., 959 A.2d 362, 2008 PA Super 238 (Pa. Super. Ct. 2008).*

173.   *Courts therefore hold that "[r]estitution ordered in criminal proceedings and civil damages are separate and independent remedies . . ."* State v. Applegate, 266 Kan. 1072, 1078, 976 P.2d 936 (1999). In so doing, courts recognize that "[t]he judge's order of restitution in a criminal action does not bar a victim from seeking damages in a separate. . civil action. Likewise, the judge . . . is not foreclosed from ordering restitution just because the victim has received compensation in a civil action." 266 Kan. at 1079.

*174.*    Pennsylvania has codified this separation of rights at 18 Pa.C.S.A. § 1106(g) ("Preservation of private *remedies. --No judgment or order of restitution shall debar the victim, by appropriate action, to recover from the offender as otherwise provided by law, provided that any civil award shall be reduced by the amount paid under the criminal judgment.").*

*175.*    *It is well established that the primary purpose of restitution is rehabilitation of the offender by impressing upon him or her that his criminal conduct caused the victim's loss or personal injury and that [217 A.3d 1224] it is his responsibility to repair the loss or injury as far as possible. Commonwealth v. Runion, 541 Pa. 202, 662 A.2d 617, 618 (1995). Thus, recompense to the victim is only a secondary benefit, as restitution is not an award of damages. Although restitution is penal in nature, it is highly favored in the law and encouraged so that the criminal will understand the egregiousness of his or her conduct, be deterred from repeating the conduct, and be encouraged to live in a responsible way. Thus, restitution, at its core, involves concepts of rehabilitation and deterrence. Commonwealth v. Brown, 603 Pa. 31, 981 A.2d 893, 895–96 (2009) (some citations omitted); Commonwealth v. Petrick, 217 A.3d 1217 (Pa. 2019).*

*176.*    *Plaintiff is aware that restitution funds actually received under the restitution order will result in the defendants obtaining an offset against any subsequent civil recovery by the victims against the criminal defendant. 18 Pa.C.S.A. § 1106(g) ("Preservation of private remedies.--No judgment or order of restitution shall debar the victim, by appropriate action, to recover from the offender as otherwise provided by law, provided that any civil award shall be reduced by the amount paid under the criminal judgment.").*

177.    *Plaintiff is sensitive to the fears of the Defendants that they not pay twice. The court must enter civil judgment in favor* of the plaintiff for the full damages, including punitive damages. Any true up for amounts received under either the restitution order or the underlying civil judgment

award against the Incarcerated Defendants may be done at the appropriate time. The judgment can set out the defendants' set off rights.

178.    The *defendants'* re-transfers of the seven properties in conformity with the restitution agreement is not a defense to a civil tort judgment under the PUVTA.

### The Lease Purchase Agreements Did Not Reflect Reasonably Equivalent Value

179.    The defendants' provided conclusive testimony to promote the "family's" self-interest. While *witnesses* were able to remember conclusory facts that supported their position, they could not recall any facts regarding details surrounding the transactions or any circumstances that would have negatively affected their interests. Imad Dawara testified that the properties were transferred in 2019 to deal with his finances while he was in prison, however, he had already provided Mr. Albarouki with a power of attorney. He was unable to provide a cogent reason for the transfers:

```
2        Q.     Did your attorney also tell you that
3   you should enter into a power of attorney with
4   someone to deal with your financial situation while
5   you were in prison?
6        A.     I don't remember.
7        Q.     But you did enter into a power of
8   attorney with it was with Mr. Albarouki?
9        A.     Yes.
10        Q.     Why did you do that?
11        A.     For him to handle my financial
12   situation with the outside while I'm incarcerated.
13        Q.     And so if you have already entered into
14   a power of attorney with Mr. Albarouki, why would you
15   also need to transfer a 50 percent interest in the
16   properties since he already has authority to deal
17   with your financial situation?
18        A.     Because I did it that way.
```

[Imad Dawara DT, p. 79]

180.   The defendants collectively have a "reputation for untruthfulness" and several of the defendants have been convicted of criminal offenses involving fraud.

181.   Even having admitted to fraud, all of the criminally convicted defendants (i.e., Imad Dawara, Bahaa Dawara and Abeer Naim) have refused in these proceedings to acknowledge their wrongdoing.

182.    In particular, both Imad Dawara and Bahaa Dawara repeatedly refused to answer questions during trial deposition testimony, including but not limited to questions about the fraud and arson they had already pled guilty to:

```
10          Q.    Did you plan with your brother to set
11   fire to the 239 Building?
12          A.    No answer.
13          Q.    Do you know who set fire to the
14   building at 239 Chestnut Street?
15                MR. KENNY:  Objection.
16   BY MR. SEITZ:
17          Q.    You can answer.
18          A.    No answer.
```

[Imad Dawara DT, p. 89]

```
 5        Q.   So you were not the person that
 6   started the fire at 239 Chestnut Street?  Is
 7   that your testimony?
 8               MR. KENNY:  Objection once
 9          again to form.
10   BY MR. SEITZ:
11        Q.   You can answer.
12        A.   I'm not answering the question
13   about the fire.
14        Q.   Did you plan with your brother to
15   burn the building at 239 Chestnut Street?
16               MR. KENNY:  Objection as to
17          form.
18   BY MR. SEITZ:
19        Q.   You can answer.
20        A.   (No response).
21               MR. SEITZ:  Let the record
22          show that the witness refuses to
23          answer my question.
```

[Bahaa Dawara DT, p. 66, see also pp. 63-64, pp. 74-75]

183.    These highly unusual (and wholly improper) refusals occurred on multiple

occasions, in relation to multiple topics and questions, during the Incarcerated Defendants'

testimony taken at FCI Fort Dix – despite their full knowledge that their depositions were part of

a trial.

184.    At no time did the Incarcerated Defendants invoke their rights under the Fifth Amendment, nor was this stated by their counsel. The reasons they cited instead included lack of comfort and "no reason."

185.    At no time did the Incarcerated Defendants' counsel instruct them not to answer the questions, notwithstanding the occasional objection. In most cases, however, the Incarcerated Defendants' refusals took place even though no objection was voiced by defendants' counsel.

186.    In all, Imad Dawara refused to answer Plaintiff's counsel's questions at least seventeen times, and Bahaa Dawara refused to answer at least five times.

187.    Contrary to their expression of accepting responsibility and remorse in the criminal proceedings, this is the behavior of defendants who are not sorry for their crimes, but only sorry that they got caught.

188.    Likewise, although she admitted to having plead guilty to health care fraud [Ex. P.8G, p. 439] at trial Naim Abeer testified:

```
 9  Q    Okay.  Ms. Naim, is it fair to say that you were convicted
10  of health care fraud?
11  A    No.  Because it's not only me; all the world is.
12  Q    Are you currently on probation?
13  A    Yes.
```

[Naim Abeer TT D2 p. 50]

189.    In other words, Naim Abeer believes that "all the world" is committing healthcare fraud, and therefore it is acceptable for her to do so as well.

190.    The defendants' conclusory testimony is uncorroborated with other evidence. In fact, much of it is directly contradicted by evidence in the record. Combined with all the other factors identified above, the defendants' testimony lacks credibility and must be disregarded.

191.     As mentioned in section titled "Defendants' Lack of Credibility" of the Proposed Findings of Fact, the Incarcerated Defendants repeatedly claimed to have no recollection of a multitude of facts and events. Imad Dawara claimed that he did not recall/remember at least 125 times during a 2-3 hour deposition.

## Remedies

192.     In this action Plaintiff seeks relief as to ten properties that were transferred by the Arsonist Defendants to family member Defendants as fraudulent transfers. 12 PA. CONST. STAT. § 5104(a)(l)("PUVTA").

## Claw Back and Transfer to Plaintiff (3 Properties)
## and Money Judgment (7 Properties)

193.     First, Plaintiff seeks to specifically claw back the transfers of three Subject Properties valued at approximately $813,600 which the Incarcerated Defendants do not have to sell under their restitution agreement with the government in their criminal case. CSC is entitled to equitable relief to make it whole for the fraudulent transfers it found including compelling the transfer of title to these three properties from the transferees to CSC subject to any outstanding tax assessments, as well as mortgage liens of record that existed at the time of the transfer and still exist (the "Liens")[7]. The transfers to these three Subject Properties are voided in a manner necessary to satisfy the Plaintiff's claim. The five transactions transferring title to the Subject Properties are set aside and title to the transferred Subject Properties is transferred from defendants to CSC subject to the Liens. CSC's claims are to be correspondingly reduced by the value of the Subject Properties, minus the value of the Liens.

---

[7] It is believed that the only mortgage encumbering any of the Subject Properties is a conventional purchase money mortgage for 19 Ridgeway.

194.     Second, as to the other seven properties, a money judgment under the PUVTA derives from a simple but hard calculation, being the value of the assets at the time they were transferred, adjusted by any equities. The creditor, CSC, obtained a judgment on its claim against the debtor Incarcerated Defendants in the Court of Common Pleas. The value of its losses exceeds $9 million. The total value of the seven properties ($1,983,400) is less than the sums that would still be owed to CSC after crediting the value of the three properties transferred by this award. CSC is awarded joint and several money judgments against all defendants for the full value of the other seven properties transferred by the Incarcerated Defendants ($1,983,400).

## Punitive Damages

195.     Under the PUFTA the Court may award a creditor "any other relief the circumstances may require." Creditors may be awarded damages in the amount of the underlying judgment -- and a multiple of that sum in punitive damages and reimbursement of attorney fees and litigation costs. For example, one court awarded nearly six times the underlying judgment in combined punitive damages and attorney's fees. *Renbolt v. Kern*, 2013 Ohio 1359, 2013 WL 1390607 (April 5, 2013). In another case, the third-party transferee was obligated to reimburse the creditor for conspiracy damages including interest on the judgment, punitive damages -- and more than a decade's worth of litigation bills. *Kekona v. Bornemann*, 305 P.3d 474 (Haw.App., May 31, 2013). The Third Circuit Court of Appeals predicted that the Pennsylvania Supreme Court would allow a creditor to recover punitive damages for violations of the Pennsylvania Uniform Fraudulent Transfer Act (PUFTA). *Klein v. Weidner*, 729 F.3d 280 (3d Cir. 2013).

196.     CSC established the underlying cause of action for the fraudulent transfer and that the defendants acted with actual malice when making the fraudulent transfers. The defendants acted in a spirit of ill will or a spirit of revenge, or with a conscious disregard for the rights of

others that had a great probability of causing substantial harm. See, Reinbolt v. Kern, Court of Appeals No. WD-12-041, 26 (Ohio Ct. App. 2013). Punitive damages are an accepted equitable remedy. Nebesho v. Brown, 846 A.2d 721, 728 (Pa. Super. 2004).

197.    The basics of CSC's claim of fraudulent transfers were clear to all defendants. The Incarcerated Defendants family members were all insiders; they were all aware of the trouble their transferor relatives found themselves in; they provided no consideration for their interests acquired from the Incarcerated Defendants. They knew that the victims of the fire would have substantial claims against their family member transferors at the times of the many conveyances in their favor. The conveyances of the ten real estate interests effectively left the Incarcerated Defendants without any assets in their sole names.

198.    In this case, the egregious conduct of the defendants is such that the court awards CSC punitive damages against all defendants jointly and severally in the multiple of two (2) times the total value of the transfers of all ten, properties, equal to $2,797,000 ($813,600 + $1,983,400) times two (2), totaling $5,594,000.

199.    Alternatively, if the court does not award punitive damages, CSC is awarded its attorneys' fees and legal costs. An application for CSC's reasonable attorney's fees and costs shall be filed within 15 days of such an order if no punitive damages are awarded. Any responses shall be filed 15 days thereafter[8].

## The Defendants Are Jointly and Severally Liable

200.    The PUVTA provides for joint and several liability. *In re Blatstein*, 260 B.R. 698, 720-21 (E.D. Pa. 2001), Schwartzman v. Rogue Intern. Talent Grp., Inc., No. 12-5255, 2014 WL

---

[8] Plaintiff respectfully asks the court to strike this paragraph if the punitive damages are awarded. Plaintiff waives its right to legal fees and costs in such circumstances.

4055833, at *3 (E.D. Pa. Aug. 13, 2014), Titus v. Shearer, 498 B.R. 508, 522 (W.D. Pa. 2013), and In re Arbogast, 466 B.R. 287, 307 (Bankr. W.D. Pa. 2012).

201.   The evidence is overwhelming that the Defendants acted as one family in connection with all the identified transfers. As such, the Defendants are jointly and severally liable for all the harm caused to Plaintiff as a result of these various transfers.

### The Plaintiff is Entitled to Pre-Judgment and Post-Judgment Interest

202.   Pre-judgment interest is "an equitable remedy awarded at the discretion of the trial court." *Sikirica v. Wettach*, 511 B.R. 760, 772 (W.D. Pa. 2014). Consideration of the following four factors before deciding whether to impose pre-judgment interest: (1) the plaintiff's diligence in prosecuting the action; (2) whether the defendant has been unjustly enriched; (3) whether the award would be compensatory; and (4) whether countervailing equitable considerations militate against an award of pre-judgment interest. *Feather v. United Mine Workers of America*, 711 F.2d 530, 540 (3d Cir. 1983). Several courts have analyzed those factors and awarded pre-judgment interest in fraudulent transfer cases under Pennsylvania law. See, e.g., *Sikirica*, 511 B.R. at 772-73; *Tiab Comms. Corp. v. Keymarket of Nepa, Inc*., 263 F. Supp. 2d 925, 947-48 (M.D. Pa. 2003) (awarding pre-judgment interest in a PUFTA case); *In re Blatstein*, 260 B.R. at 721-23 (remanding to the Bankruptcy Court with instructions to consider an award of pre-judgment interest in a PUFTA action). Since the cause of action is brought under state law, pre-judgment interest must be calculated at the Pennsylvania statutory rate.

203.   Post-judgment interest, 28 U.S.C. § 1961(a) provides that it "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a). The Third Circuit

66

has held that such interest must be calculated based upon the amount of the judgment combined

with the amount of pre-judgment interest. See *Skretvedt v. E.I. DuPont de Nemours*, 372 F.3d 193,

217 (3d Cir. 2004).

204.    In this case, first, Plaintiff's diligence in prosecuting the action is evident by the

fact that the complaint was filed shortly after Mr. Mogilyansky learned of the transfers at issue.

[TT Day 1, p. 27, l. 5 through 11] Second, the court must have found the Un-incarcerated

Defendants were unjustly enriched by the transfers in order to have found them liable for

fraudulent transfers. Third, pre-judgment interest would compensate Plaintiff for the time-value of

money during the delays caused by the Defendants collectively. Finally, no countervailing

equitable considerations militate against an award of pre-judgment interest.

## Judgment

205.    Accordingly, for all the foregoing reasons, the Court orders as follows:

> (a) <u>Money Judgment</u>. A judgment is entered in favor of Plaintiff and against all
>
> Defendants, jointly and severally, as follows:
>
> > (1) Compensatory Damages:        $1,983,400
> >
> > (Value of 7 forfeited properties)
> >
> > (2) Punitive Damages:            $5,594,000
> >
> > (2 x $2,797,000 value of all 10 properties)
> >
> > (3) Fees and Costs:              $___TBD___
> >
> > (if punitive damages are not awarded)
> >
> >                    **Total:      $_____**
>
> (b) <u>Pre-Judgment Interest</u>. Pre-judgment interest on the foregoing amount is
>
> awarded at the Pennsylvania statutory rate starting from November 14, 2019

(the date on or before which the first batch of deeds for all ten properties were executed).

(c) <u>Equitable Relief</u>.

   (1) No later than within ten (10) days after the date of this order, title to the following three properties ("Subject Properties") shall be transferred from pertinent Defendants to Plaintiff, subject to all Liens (as previously defined):

   **1. 19 Ridgeway Ave, Norwood, Delaware County, PA (Delaware County Parcel No. 31-00-01187-00)**

   **2. 305 Seminole Street, Essington, Delaware County, PA (Delaware County Parcel No. 45-00-01849-00)**

   **3. 407 Seminole Street, Essington, Delaware County, PA (Delaware County Parcel No. 45-00-01841-01)**

   (2) For purposes of the above, Defendants shall within five (5) days of this order execute quitclaim deeds for the Subject Properties in favor of Plaintiff.

   (3) If for any reason any of the defendants refuses to cooperate in the execution of the deeds, the Recorder of Deeds for Delaware County is hereby directed to effectuate transfers of title to Subject Properties to Plaintiff upon recordation of this Order, without the need for quitclaim deeds signed by defendants.

   (4) Defendants and all other residents shall vacate the Subject Properties within 30 days from entry of this order unless they negotiate a new

lease for the Subject Properties on terms acceptable to Plaintiff in its discretion.

(d) <u>Offsets</u>. Plaintiff shall offset Incarcerated Defendants' liability under the judgment issued in the Philadelphia Court of Common Pleas and, simultaneously by the total value of the Subject Properties transferred hereunder, less the value of the Liens, as follows:

(1) 19 Ridgeway Ave, Norwood, PA valued at:      $350,600

(2) 305 Seminole Street, Essington, PA valued at:    $240,800

(3) 407 Seminole Street, Essington, PA valued at:    $222,200

**Total Base (before reduction for Liens):**    **$813,600**

(4) The value of the Liens, if any, to be determined by a title agency to be retained by Plaintiff, shall be subtracted from the foregoing amount in order to calculate the amount of the offset, and all defendants will cooperate by promptly obtaining and providing current mortgage statement(s) for the Subject Properties.

(5) If Plaintiff chooses to pay off mortgage(s) encumbering the Properties at the time of such transfer(s) or at a later time, defendants shall cooperate with such payoff(s) by facilitating Plaintiff's or Plaintiff's title agency's communications with the mortgage lender(s) and instructing the lender(s) to satisfy the mortgage lien(s) upon receipt of appropriate payment(s) from Plaintiff. If defendants refuse to cooperate, mortgage lenders are hereby directed to mark mortgage

liens against Subject Properties satisfied upon receipt of full payment from Plaintiff.

(6) Plaintiff shall further offset Incarcerated Defendants' liability under the judgment issued in the Philadelphia Court of Common Pleas and, simultaneously, under the defendants' joint and several liability under this judgment, dollar for dollar, by any amounts received by David Ciurlino, Steven Gelbart, Fresher Start Corporation, or by Plaintiff, from any restitution paid by the Incarcerated Defendants in Case No. 19-CR-414 (EDPA).

(e) <u>Post-Judgment Interest</u>. Post-judgment interest shall accrue on any unpaid balance of this judgment at the Pennsylvania statutory rate from the date of this order.

(f) <u>Joint and Several Liability</u>. Defendants shall be jointly and severally liable for the performance all obligations set forth in this order.

Dated: June 6, 2022                    **GELLERT, SCALI, BUSENKELL & BROWN, LLC**

/s/ Gary F Seitz
Gary F. Seitz (Attorney I.D. No.: 52865)
1628 John F. Kennedy Boulevard, Suite 1901
Philadelphia, Pennsylvania 19103
Telephone: (215) 238-0010
Fax: (215) 238-0016
gseitz@gsbblaw.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I, Gary F. Seitz, hereby certify that on June 6, 2022, I caused a true and correct copy of the

foregoing **Proposed Findings of Fact and Proposed Conclusions of Law of CSC** to be served

on all parties of record by email and ECF transmission.

<u>/s/ Gary F. Seitz</u>
Gary F. Seitz